UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DESHAWN SCOTT,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )        CIVIL NO.  2:10cv366
                                  )
MICHAEL J. ASTRUE,                )
COMMISSIONER OR                   )
SOCIAL SECURITY,                  )
                                  )
        Defendant.                )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying plaintiff's application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social

Security Act.  42 U.S.C. §416(I); 42 U.S.C. §423; 42 U.S.C. §§ 1382, 1382c(a)(3).  Section

205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based.  The court shall have the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.     The claimant meets the insured status requirements of the Social Security

Act through June 30, 2009.

2. The claimant has not engaged in substantial gainful activity since April 1, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairment: epilepsy (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404 Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work exertionally as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant cannot climb ladders, ropes, or scaffolds. The claimant cannot work at or around unprotected heights or hazards, and must avoid concentrated exposure to temperature extremes. He is limited to unskilled work which doesn't have high production quotas or sales responsibilities.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 18, 1975 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 24-34).

Based upon these findings, the ALJ determined that Scott was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Scott filed his opening brief on March 18, 2011. On June 28, 2011, the defendant filed a memorandum in support of the Commissioner's decision, and on July 13, 2011, Scott filed his reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be affirmed. A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Scott filed DIB and SSI applications on June 22, 2007, alleging disability beginning April 1, 2007, due to seizures. Scott's DIB and SSI applications were denied initially and upon reconsideration. Scott subsequently requested a hearing before an administrative law judge. Scott appeared with counsel and testified at a hearing held by Administrative Law Judge Mona Ahmed ("ALJ") on September 9, 2009. On November 18, 2009, the ALJ determined that Scott was not

disabled, as defined by the Act, and thus was not entitled to DIB or SSI benefits (Tr. 22-34). The ALJ's decision became final when the Appeals Council denied Scott's request for review on July 27, 2010.

Scott was 31 years old on his alleged disability onset date and, therefore, was classified as a "younger individual" under the regulations (Tr. 33, 167). See 20 C.F.R. § 404.1563(c). Scott had at least a high school education and was able to communicate in English (Tr. 33, 219, 225). Scott had past relevant work experience as a telephone solicitor and as a store laborer (Tr. 33, 95, 319).

According to his testimony, Scott was struck on the side of a head with a hammer at 17 years old and began having seizures approximately one year later. (AR 57, 542, 624). He had both small and large seizures: the small seizures occurred every other day and caused him to lose focus and concentration (AR 247, 250, 261, 263, 507), and his hands to shake and nerves to twitch (AR 57); and the large seizures[1] occurred two to three times per month (AR 58, 589, 591).

In January 2004, Scott's seizure medication, Dilantin, level was documented as being at a subtherapeutic level of 3.80 ug/mL (Tr. 439). In September 2004, Scott was treated for a seizure in the emergency room (Tr. 337). At that time, it was noted that Scott had missed recent doses of his seizure medications (Tr. 337).

In October 2005, Scott was treated for a seizure in the emergency room (Tr. 351-55). Scott reported that his last seizure had been about one year earlier (Tr. 351). Although Scott alleged that

---

[1]     Large seizures are known as "grand mal seizures" or "tonic-clonic" seizures. *See* http://www.mayoclinic.com/health/grand-mal-seizure/DS00222. A grand mal seizure "features a loss of consciousness and violent muscle contractions" and is "caused by abnormal electrical activity throughout the brain." *Id.* Symptoms of grand mal seizures include screaming, loss of bowel and bladder control, unresponsiveness after convulsions, confusion, fatigue, and severe headaches. *Id.* at 2.

he took all of his Dilantin the previous day, Scott's Dilantin level was documented as being at a subtherapeutic level of 3.5 ug/mL (Tr. 354). A CT scan of Scott's brain was negative with no acute intracranial hemorrhage or mass effect (Tr. 356). Scott was diagnosed with subtherapeutic Dilantin level and seizure (Tr. 350). Scott was advised to conform to a regular Dilantin regimen and was discharged from the hospital (Tr. 350).

In December 2005, Dr. William McKenna conducted a consultative physical examination on Scott (Tr. 374-78). Scott alleged that he was disabled due to a history of seizures and reported that he did not have any other medical complaints (Tr. 374). Scott reported that he had experienced four seizures over the past year (Tr. 374). Later in the examination, Scott also reported that he had some lower back pain that caused him to be unable to stand for very long, but that did not cause any difficulties walking, sitting, bending, or stooping (Tr. 374). Upon physical examination, Dr. McKenna noted that Scott walked with a normal gait, had full motor strength in his extremities, was neurologically intact, had normal sensation, had full manual dexterity, and had no musculoskeletal deformities (Tr. 376-77). Dr. McKenna further noted that Scott's orientation, memory, appearance, behavior, and ability to relate during a mental status examination were entirely within normal limits (Tr. 377). Dr. McKenna diagnosed Scott with history of major motor seizure disorder with tonoclonic seizures and a history of low back pain that did not interfere with walking, sitting, or any other activities (Tr. 377).

In January 2006, Dr. Jimenez Frank, a state agency reviewing physician, opined that Scott did not have any exertional limitations (Tr. 399). Dr. Frank opined that Scott could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds (Tr. 400). Dr. Frank further opined that Scott must avoid concentrated exposure to workplace hazards, such as machinery and heights (Tr. 402).

In March 2006, Scott was admitted to the emergency room after having a seizure (Tr. 540-44). Scott reported that he had not had a seizure since October 2005 (Tr. 542). At that time, Scott reported that he was compliant with his medications and it was noted that Scott's Dilantin level was at therapeutic levels (Tr. 541, 542). It was also noted that Scott had no focal neurological findings and no changes in speech, vision, strength, or sensation (Tr. 541). Scott was advised to progressively increase activity and to work as tolerated and appropriate (Tr. 543). He was advised to alternate between 3 and 4 Dilantin pills each day (Tr. 543). Scott was subsequently discharged from the hospital in stable condition (Tr. 543-44).

In August 2007, Dr. Frank Jimenez, a state agency reviewing physician, indicated that Scott could not be found disabled due to his failure to cooperate in helping to obtain his medical and non-medical evidence (Tr. 406-408). Dr. Jimenez indicated that Scott had failed to respond to all of the Agency's attempts to obtain relevant evidence from him (Tr. 408).

In September 2007, Scott was hospitalized after he was involved in a motor vehicle accident with complaints of neck pain (Tr. 415-21). The hospital treatment notes reflect that Scott reported that his last seizure occurred about four months ago and that he was currently taking 300 mg of Dilantin per day (Tr. 417). The treatment notes indicated that Scott did not sustain any significant injuries as a result of the motor vehicle accident (Tr. 418-19). Scott's motor and sensory function were noted to be within normal limits (Tr. 420). An x-ray of Scott's chest and CT scans of Scott's brain and cervical spine were all negative (Tr. 420, 428, 429, 430). At that time, Scott's Dilantin level was documented as being at a subtherapeutic level of 6.5 ug/mL (Tr. 433). Scott was subsequently discharged from the hospital and given Tylenol for pain as needed (Tr. 421).

In November 2007, Dr. David Bitzer, a state agency reviewing physician, opined that Scott could lift and/or carry 50 pounds occasionally and 25 pounds frequently, could stand and/or walk for

6 hours in an 8-hour workday, and could sit for 6 hours in an 8-hour workday (Tr. 531). Dr. Bitzer also opined that Scott could frequently balance, but could never climb ladders, ropes, or scaffolds (Tr. 532). Dr. Bitzer further opined that Scott must avoid concentrated exposure to workplace hazards, such as machinery and heights (Tr. 534).

In March 2008, Scott was admitted to the emergency room after having a seizure (Tr. 558-64). Upon admission, the EMS technicians reported that Scott was not compliant with his Dilantin medication (Tr. 559). Subsequent testing revealed that Scott's Dilantin level was at a subtherapeutic level of 3.3 ug/mL (Tr. 558, 560). Upon taking Dilantin while at the hospital, Scott reported that he was feeling "fine" and was discharged in stable condition (Tr. 558-59, 563). Scott was advised to take his Dilantin medication as directed and to follow-up with his doctor to discuss whether or not he needed to be on a higher dosage of Dilantin (Tr. 563).

In April 2008, Scott was again hospitalized after having a seizure (Tr. 566-71). Upon admission, Scott reported he took 300 mg of Dilantin each day and did not feel as if he had missed any doses (Tr. 566). However, later that day, Scott admitted that he had been noncompliant with his Dilantin medication (Tr. 568). At that time, Scott's Dilantin level was documented as being at a subtherapeutic level of only 1.5 ug/mL (Tr. 568). Scott was given Dilantin via an IV while hospitalized (Tr. 570). Scott was advised to take his Dilantin medication as prescribed and to follow-up with a neurologist as scheduled to recheck his Dilantin levels within the next 1-2 weeks (Tr. 571). Scott was discharged from the hospital in stable condition (Tr. 571).

Later that day, Scott returned to the hospital after having another seizure shortly after being discharged (Tr. 573-80). Following admission for his second seizure, Scott expressed a desire to leave the hospital, even after being told by his physicians of the risk of leaving with poorly controlled symptoms (Tr. 575). Scott agreed to stay for a CT scan, which was unremarkable (Tr. 575). Scott

was then discharged and advised to restart his Dilantin that night and to schedule an appointment with his neurologist as soon as possible to adjust his medications (Tr. 579).

In August 2008, Scott was admitted the hospital after having a seizure that morning (Tr. 582-86). At the time of admission, it was noted that Scott's symptoms had improved (Tr. 582). The hospital records again reflected that Scott's Dilantin level was at subtherapeutic levels (Tr. 583). While hospitalized, Scott was given Dilantin via an IV (Tr. 585). Scott was later discharged in stable condition (Tr. 586).

Ten days later, Scott presented to Dr. Charles Barron, a family practice physician, for a well adult examination (Tr. 601-04). Scott reported that he had seizures for the past 13 or 14 years after suffering a traumatic head injury (Tr. 601). Dr. Barron's physical examination findings were unremarkable (Tr. 602). At that time, Scott's Dilantin level was found to be within the therapeutic range at 11.1 ug/mL (Tr. 603).

In September 2008, Dr. Barron completed a Medical Evaluation - Physician's Report form and a Seizures Residual Functional Capacity Questionnaire form (Tr. 587-94). Dr. Barron reported that Scott suffered two or three seizures per month while remaining compliant with his Dilantin medication (Tr. 589, 591). He indicated that stress and temperature extremes were precipitating factors for Scott's seizure activity (Tr. 591). Dr. Barron opined that Scott could lift no more than 20 pounds occasionally and 10 pounds frequently (Tr. 590). Dr. Barron indicated that Scott had full capacity to perform walking, standing, sitting, bending, turning, speaking, traveling, performing fine and gross manipulations, and performing activities of daily living (Tr. 590). He indicated that Scott's ability to climb, push, and pull were somewhat reduced (Tr. 590). Dr. Barron opined that Scott's seizures were likely to disrupt the work of his co-workers and would require more supervision at work than an unimpaired worker (Tr. 592). He further opined that Scott's seizures

would preclude him from working at heights, operating power machinery, or driving a motor vehicle (Tr. 592). Dr. Barron indicated that Scott would need to take unscheduled 15 minute breaks at a frequency of 3 or 4 times per workday (Tr. 593). He opined that Scott was incapable of performing even low stress jobs because stressful situations tended to bring on his seizures (Tr. 593). He further opined that Scott would miss about four days per month due to his seizures (Tr. 593).

In January 2009, Scott had another seizure and was treated at the St. James Hospital emergency room (Tr. 628). At that time, Scott reported that his last seizure was a few months earlier (Tr. 624). Scott's Dilantin level was documented as being at a subtherapeutic level of 8.0 ug/mL (Tr. 626, 627). A CT scan of Scott's head was normal with no acute changes (Tr. 626). Scott was subsequently discharged from the hospital in an alert and fully oriented condition (Tr. 632).

In February 2009, Dr. H. L. Cordero reported that Scott was under his care and was currently self-administering 100 mg of Dilantin twice a day for his epilepsy (Tr. 607). Dr. Cordero indicated that Scott was medically/psychiatrically stable (Tr. 607). He issued Scott a medical/psychiatric clearance (Tr. 607).

In April 2009, Scott had another seizure and was treated at the St. James Hospital emergency room (Tr. 615-21). Scott's Dilantin level was documented as being at a subtherapeutic level of 6.3 ug/mL (Tr. 617, 618). Scott was given an IV of Dilantin while hospitalized (Tr. 620). Scott was discharged in good ambulatory condition (Tr. 620). In May 2009, Scott had another seizure and was treated at the St. James Hospital emergency room (Tr. 640-41). He reported that his last seizure had occurred about a month earlier (Tr. 640).

At the administrative hearing, Scott testified that he was unable to work due to seizures (Tr. 49-50). Scott testified that he started having seizures when he was 18 years old after suffering a head injury (Tr. 57). Scott testified that he sometimes had smaller seizures almost every other day, which

were characterized by his hands shaking, his nerves twitching, losing focus, and completely spacing out (Tr. 57). Scott testified that he placed a cold or cool towel over his head whenever he experienced a small seizure (Tr. 57).

Scott also testified that he had full breakthrough seizures about once or twice a month (Tr. 57-58). He alleged that he did not always go to the emergency room when he had these seizures, as he typically only went to the emergency room when he had more than one seizure back to back (Tr. 58). Scott testified that, when he had these full seizures, he heard a high-pitched ringing in his head that was followed by nausea, constant shaking, and a period of lightheadedness, unawareness, and loss of focus that lasted for ten to thirty minutes (Tr. 59). After experiencing a seizure, Scott testified that he typically had a headache and had to sit down and rest for about a half an hour (Tr. 59-60). Scott testified that his seizures were caused by stress, extreme temperature conditions, and exposure to mold (Tr. 51-52, 60-61). He alleged that the stress from trying to make quotas and goals on a sales job would cause him to have seizures (Tr. 62).

Scott testified that he took Dilantin medication to control his seizures every day and that he never missed a dose (Tr. 50). Upon being asked about the repeated findings of subtherapeutic Dilantin levels in the hospital records, Scott alleged that his Dilantin level was not within the therapeutic range because he smoked cigarettes (Tr. 50-51). Scott testified that his doctors did not instruct him to stop smoking, but merely told him that smoking cigarettes can decrease his Dilantin levels (Tr. 51).

Scott testified that he last worked in 2008 as a salesman at ABC Glass Company, a window sales company (Tr. 48-49). Scott testified that he was fired from his job at ABC Glass Company because he did not meet his sales quotas (Tr. 49).

Dr. Hugh Savage, a medical expert, provided expert medical testimony at the administrative

hearing (Tr. 83-93). Dr. Savage testified that Scott had generalized epilepsy that did not meet or equal a listed impairment (Tr. 84-90). Dr. Savage noted that the record did not establish that Scott had seizures more than once per month as required to meet Listing 11.02 for convulsive epilepsy (Tr. 85). Dr. Savage indicated that Scott went long periods of time where he did not experience any seizures requiring treatment and that the record did not contain any regular visits to doctors in which he reported having seizures in between emergency room visits (Tr. 85). Dr. Savage also testified that the great majority of Scott's documented Dilantin levels were at subtherapeutic levels at his emergency room visits for seizures, which suggested that Scott was non-compliant with his medication regimen (Tr. 86-87, 91). He opined that, if Scott were to comply with his prescribed treatment, then Scott's seizures would decrease in frequency (Tr. 90). He noted that when Scott presented to the emergency room following a seizure with subtherapeutic levels of Dilantin, the emergency room personnel generally administered a loading dosage of Dilantin and then discharged him from the hospital (Tr. 91). Dr. Savage testified that if Scott's Dilantin levels had been at therapeutic levels when he presented to the emergency room with seizures, then it would be very hard to justify discharging Scott when there were other anti-seizure medications that could be utilized (Tr. 91).

Dr. Savage testified that Scott's explanation that his cigarette smoking caused him to have subtherapeutic levels of Dilantin did not make any sense in light of the record (Tr. 86). He testified that he was not aware of any such dramatic effects of cigarette smoking that would cause subtherapeutic Dilantin levels to the extent documented in Scott's medical records (Tr. 86). He further testified that, if Scott's testimony were true, then Scott's physician would have either instructed him to stop smoking or would have adjusted his Dilantin dosage as needed to account for the effects of his cigarette smoking (Tr. 86-87).

12

Based on his review of the medical records and Scott's testimony, Dr. Savage opined that Scott was capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and walking without limits, and sitting without limits (Tr. 92). He opined that Scott should never climb ladders, ropes, or scaffolds and should not work around unprotected heights or temperature extremes (Tr. 92-93). Dr. Savage also opined that Scott's job-related stress should be minimized (Tr. 92).

At the administrative hearing, the ALJ described a hypothetical individual of Scott's age, education, and work experience who was limited to performing a restricted range of light work that did not involve any climbing of ladders, ropes, or scaffolds; any work at or around unprotected heights or hazards; or concentrated exposure to temperature extremes (Tr. 95). The hypothetical individual was further limited to unskilled work that did not involve high production quotas or sales responsibilities (Tr. 95). Mr. Richard Fisher, a vocational expert ("VE"), testified that such a hypothetical individual would be capable of performing 7,143 jobs as a janitor/cleaner, 1,466 jobs as a photocopy/photographic machine operator, and 3,990 jobs as a traffic clerk/routing clerk/car checker in the state economy (Tr. 96). The VE also testified that such jobs would allow for unanticipated absences about once per month (Tr. 100-01).

In support of reversal of the ALJ's decision denying him benefits, Scott first argues that the ALJ improperly evaluated the medical opinions. Scott notes that the ALJ gave "very significant weight" to the opinion of the medical expert, Dr. Savage, and little weight to the opinion of Dr. Barron, Scott's treating physician.

Dr. Barron, a family practice physician, completed two forms – a Medical Evaluation Physician's Report form and a Seizures Residual Functional Capacity Questionnaire form – after examining Scott on one or two occasions in September 2008 (Tr. 587-90, 591-94). Dr. Barron indicated that Scott experienced seizures on an average frequency of 2 to 3 times per month while

remaining complaint with his medications (Tr. 589, 591, 592). Dr. Barron reported that precipitating factors for Scott's seizures included stress and temperature extremes (Tr. 591). Dr. Barron opined that Scott was able to lift up to 20 pounds occasionally and 10 pounds frequently and was able to walk, stand, and sit without limitation (Tr. 590). He opined that Scott was somewhat limited in his ability to climb, push, and pull (Tr. 590). Dr. Barron further opined that Scott's seizures would likely disrupt the work of his co-workers and would preclude him from working at heights, around machinery, or while operating a motor vehicle (Tr. 592). Dr. Barron also indicated that Scott's seizure disorder would (1) require him to take unscheduled 15-minute breaks 3 to 4 times per work day; (2) make him incapable of performing even "low stress" jobs; and (3) cause him to be absent from work about 4 days per month (Tr. 593).

This court agrees with the defendant that, upon considering the evidence of record, the ALJ reasonably determined that certain aspects of Dr. Barron's opinions were not entitled to significant weight because they were not well-supported by the medical evidence and were inconsistent with other substantial evidence of record (Tr. 28-29). While the ALJ agreed with Dr. Barron's opinion that Scott was capable of performing the exertional requirements of light work with minimal postural or manipulative limitations and some environmental limitations (Tr. 29, 590, 592), the ALJ reasonably found that several of Dr. Barron's other more extreme opinions about the effects of Scott's seizure disorder were not entitled to any significant weight (Tr. 29, 592-93). In particular, the ALJ discounted Dr. Barron's opinions that Scott would be incapable of performing even low stress jobs, that he would require frequent unscheduled breaks, and that he would frequently be absent because of seizures. (Tr. 29, 593).

The ALJ noted that Dr. Barron's statements indicating that Scott suffered 2 to 3 seizures per month while remaining compliant with his medications was not supported by the record (Tr. 29, 589,

591, 592). Indeed, contrary to Dr. Barron's statements, the record does not demonstrate that Scott experienced seizures at an average frequency of 2 to 3 times per month. As noted by the ALJ, the record reflects that the greatest number of seizures that Scott experienced in any 12-month calendar year was four (Tr. 31, 337 [September 2004], 351-55 [October 2005], 540-44 [March 2006], 558-64 [March 2008], 566-71 [April 2008], 573-80 [April 2008], 582-86 [August 2008], 624-32 [January 2009], 615-21 [April 2009], 640-41 [May 2009]). Notably, the record reflects that Scott regularly went several months without having a seizure. For example, when Scott suffered a seizure in March 2006, Scott reported that his most recent seizure was in October 2005, or about five months earlier (Tr. 542). Likewise, when Scott was treated for minor injuries sustained in a motor vehicle accident in September 2007, Scott reported that his last seizure had occurred four months earlier and the record does not reflect that Scott was treated for another seizure until March 2008 (Tr. 417, 558-64). Similarly, in January 2009, Scott reported that his last seizure had occurred a few months earlier (Tr. 624). The record reflects that the only month in which Scott suffered more than one seizure was April 2008 (Tr. 566-71, 573-80).

At the consultative examination, Scott reported that he had experienced only four seizures over the past year (Tr. 374). Thus, Scott's own self-reports about his seizure activity in the medical records, along with the medical treatment records themselves, do not reflect that Scott experienced seizures at an average frequency of 2 or 3 times per month, as reported by Dr. Barron (Tr. 589, 591). Thus, given that Dr. Barron's opinions were based on an inaccurate description of the frequency of Scott's seizure activity, the ALJ reasonably discounted the weight given to Dr. Barron's opinions about Scott's limitations secondary to his seizure activity (i.e., that he would require frequent unscheduled breaks and that he would frequently be absent from work because of seizures) (Tr. 29).

The ALJ also noted that Dr. Barron's statement that Scott was compliant with his anti-

seizure medications was not supported by the record (Tr. 29). In this case, the ALJ reasonably

determined that the record indicated that Scott was not compliant with his prescribed anti-convulsant

medication regimen (Tr. 27, 30-32). Throughout his brief, Scott repeatedly attempts to argue that

the ALJ's finding that he was not compliant with his prescribed treatment was improper or

erroneous; however, Scott's arguments are not supported by the record. Social Security Ruling 87-6

recognizes that "[a]s a result of modern treatment which is widely available, only a small percentage

of epileptics, who are under appropriate treatment, are precluded from engaging in substantial

gainful activity." See Social Security Ruling ("SSR") 87-6, 1987 WL 109184, at *1 (1987). SSR

87-6 continues stating that:

> "Situations where the seizures are not under good control are usually due to the individual's
> noncompliance with the prescribed treatment rather than the ineffectiveness of the treatment
> itself. Noncompliance is usually manifested by failure to continue ongoing medical care and
> to take medication at the prescribed dosage and frequency. Determination of blood levels of
> anticonvulsive drugs may serve to indicate whether the prescribed medication is being
> taken."

Id. In the present case, the ALJ reasonably noted that Scott's anticonvulsant drug levels were below

the therapeutic range nearly every time that they were tested (Tr. 354, 433, 558, 560, 568, 583, 617,

618, 626, 627). In reporting that Scott was compliant with his medication, Dr. Barron noted that

Scott had a therapeutic level of Dilantin when tested in August 2008 (Tr. 592, 603); however, Dr.

Barron either ignored or was unaware of the fact that Scott had subtherapeutic Dilantin levels on

nearly every other occasion tested (Tr. 354, 433, 558, 560, 568, 583, 617, 618, 626, 627). As

recognized in SSR 87-6, "[t]he predominant reason for low anticonvulsant blood levels is that the

individual is not taking the drugs as prescribed." SSR 87-6, 1987 WL 109184,at *3. SSR 87-6 also

 recognizes that:

> "In extremely rare cases, individual idiosyncrasy in absorption or metabolism of the drug

> causes therapeutically inadequate anticonvulsant blood levels. The reasons for abnormal absorption or metabolism of these drugs is linked to the individual's clinical condition and would have to be recognized by the treating physician in his or her efforts to obtain control of the seizures. Therefore, a finding that low anticonvulsant blood levels are caused by idiosyncrasy in absorption or metabolism must be based on specific descriptive evidence provided by the treating physician. "

Id. Scott attempts to argue that his low anticonvulsant drug levels were due to "individual idiosyncrasy in absorption or metabolism of the drug." Yet Scott fails to point to any persuasive evidence that supports his argument. Notably, none of the treating, examining, or reviewing medical sources of record indicated that Scott's low anticonvulsant drug levels were due to individual idiosyncrasy in absorption or metabolism of his Dilantin anticonvulsant medication. Rather, in their post-seizure treatment of Scott, Scott's treating physicians regularly noted that Scott had subtherapeutic levels of Dilantin and then proceeded to administer a loading dose of Dilantin and recommend that he take his medications as prescribed (Tr. 350, 563, 571, 585, 620).

This type of post-seizure treatment suggests that Scott's treating physicians believed that Scott's subtherapeutic Dilantin levels were due to noncompliance rather than any individual idiosyncrasy in absorption or metabolism of the Dilantin drug. Indeed, at the administrative hearing, Dr. Savage testified that the record indicated that Scott's subtherapeutic Dilantin levels were attributable to noncompliance with his prescribed anticonvulsant medications as opposed to any individual idiosyncrasy in absorption or metabolism of the drug (Tr. 86-88, 90-91). Dr. Savage also testified that Scott's allegation that his Dilantin levels were subtherapeutic due to his smoking did not make any sense in the context of the medical records and did not adequately explain his exceedingly low Dilantin levels throughout the record (Tr. 86-87). Dr. Savage testified that Scott's seizures would decrease in frequency if he complied with his prescribed anticonvulsant treatment (Tr. 90-91). Thus, the ALJ's finding that Scott was not compliant with his prescribed anticonvulsant

medications was well-supported by the medical records as well as by the expert medical testimony of Dr. Savage.

Furthermore, Scott himself admitted that he had been non-compliant with his Dilantin medication in April 2008 after being treated for a seizure (Tr. 586). Although Scott attempts to gloss over his damaging admission by arguing that he was disoriented to place, person, and purpose at the time of his admission of noncompliance, Scott's argument is not supported by the hospital's treatments notes (Tr. 567-68). Significantly, whereas the hospital treatment notes dated April 27, 2008 reflect that Scott was disoriented shortly after his admission to the hospital at 9:06 a.m. after having a seizure, the treatment notes indicate that Scott had re-established his orientation to place, person and purpose by 11:16 a.m., several hours after his seizure and after having received a loading dose of Dilantin (Tr. 567-68). Scott's admission that he was non-compliant with his medications came at 11:17 a.m., at which point it was noted that he was fully oriented with normal affect (Tr. 568).

In addition to being corroborated by his consistently subtherapeutic levels of Dilantin, Scott's admission of noncompliance was further supported by other treatment notes in the record. For example, in September 2004 when Scott was treated for a seizure, it was noted in the emergency room records that Scott had missed recent doses of his seizure medications (Tr. 337). Likewise, in March 2008 when Scott was treated for another seizure, it was noted that EMS personnel had reported that Scott was noncompliant with his seizure medications (Tr. 559). Thus, contrary to Scott's arguments, the record contained numerous references to his noncompliance that provided substantial support for the ALJ's finding.

Additionally, the ALJ noted that the record reflected that Scott's seizures were relatively well-controlled when he was compliant with his Dilantin medication (Tr. 30, 32). For

example, treatment notes from 2002 indicate that, when he was compliant with his medication and his Dilantin levels were within the therapeutic range, Scott repeatedly reported that he had not experienced any seizures (Tr. 443, 444, 445, 446). Thus, this evidence further suggests that Scott's ongoing seizure activity was, in part, attributable to his own failure to take his medications as prescribed.

As discussed above, the ALJ's finding that Scott was not compliant with his antiseizure medications was well-supported by the evidence of record. Although Scott attempts to argue that the ALJ was required by SSR 87-6 to obtain additional information from his treating physician about why his reported anticonvulsant drug levels were subtherapeutic, Scott's argument is not supported by the language of SSR 87-6 or any relevant case law. Notably, SSR 87-6 states that "[u]nless convincing evidence is provided that subtherapeutic blood drug levels are due to abnormal absorption or metabolism, and the prescribed drug dosage is not itself inadequate, the conclusion should follow that the individual is not complying with the treatment regimen." SSR 87-6, 1987 WL 109184, at *3.

In the present case, it is clear that Scott has failed to meet his burden of providing evidence that indicates that his subtherapeutic blood drug levels were due to abnormal absorption or metabolism. Rather, as discussed above, the record is replete with compelling evidence of Scott's noncompliance with his prescribed anticonvulsant medication. Under the regulations and SSR 87-6, an ALJ is only required to re-contact a treating physician when "the evidence received is inadequate to determine whether the claimant is disabled." Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004); see also 20 C.F.R. § 404.1512(e); SSR 87-6, 1987 WL 109184, at *2. In the case at bar, the ALJ relied on substantial evidence that demonstrated that Scott was not compliant with his prescribed seizure medication, including consistently subtherapeutic Dilantin levels, Scott's own

admissions of non-compliance, repeated notations of non-compliance in the medical records, as well as the expert medical opinion of Dr. Savage. The ALJ also noted that the record did not contain any evidence that suggested that Scott's subtherapeutic Dilantin levels were due to any other cause besides non-compliance. Because the evidence of record was not inadequate to determine whether Scott was compliant with his seizure medication, the ALJ was not required to re-contact any treating physician for clarification.

Accordingly, the court holds that the ALJ's findings that Scott was non-compliant with his seizure medications and that the frequency of his seizures would improve if he was compliant was supported by substantial evidence. Because Dr. Barron's statement that Scott had seizures 2 to 3 times per month despite being compliant with his medications was not supported by the record and served as the basis of his opinion, the ALJ reasonably discounted the weight given to Dr. Barron's opinions about Scott's limitations based on his seizure activity (Tr. 29).

The ALJ further noted that Dr. Barron's treatment relationship with Scott did not warrant attributing any significantly increased weight to his opinion (Tr. 29). The ALJ noted that Dr. Barron had treated Scott on only one or two occasions prior to rendering his opinions about Scott's residual functional capacity (Tr. 29). Indeed, the record reflects that Dr. Barron first examined Scott on August 14, 2008 and then completed the two forms regarding Scott's functional capabilities on September 5, 2008, the date of his second examination of Scott and less than three weeks after initiating treatment (Tr. 587, 590, 591, 594, 601-02). Under 20 C.F.R. § 404.1527(d)(2), an ALJ is directed to consider (1) the length of the treatment relationship and the frequency of examination and (2) the nature and extent of the treatment relationship when determining how much weight to give medical source opinions. See 20 C.F.R. §§ 404.1527(d)(2)(I), 404.1527(d)(2)(ii).

The regulations state that "[w]hen the treating source has seen you a number of times and

long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(d)(2)(I). In the present case, considering that Dr. Barron examined Scott on only one or two occasions over a span of less than three weeks prior to rendering his opinions, the ALJ was not required to attribute significantly increased weight to Dr. Barron's opinion on the basis of his treatment relationship with Scott, as the length and extent of his treatment relationship were very limited to the extent that it did not allow Dr. Barron to obtain a detailed, longitudinal picture of Scott's seizure disorder. See Schenck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004) ("It would be exceedingly illogical to credit a doctor's opinion because he is more likely to have a detailed and longitudinal view of the claimant's impairments when in fact, there is no detail or longitudinal view.").

In the present case, the ALJ recognized the limited value of Dr. Barron's brief treatment relationship with Scott by noting that Dr. Barron's findings regarding Scott's compliance with his medication were based on a single blood test dated August 18, 2008, that indicated that Scott's Dilantin was at therapeutic levels (Tr. 603), which stood in contrast to the results of nearly every other test of record which consistently indicated that Scott's Dilantin was at subtherapeutic levels (Tr. 29, 354, 433, 558, 560, 568, 583, 617, 618, 626, 627). Additionally, given that Dr. Barron had treated Scott for less than three weeks when he rendered opinions, Dr. Barron's brief treatment relationship with Scott did not provide him with the longitudinal perspective needed to accurately report the average frequency of Scott's seizures per month (Tr. 29). Notably, as discussed above, Dr. Barron's statement that Scott suffered an average of 2 to 3 seizures per month was not supported by the medical evidence of record. For the foregoing reasons, the ALJ reasonably determined that Dr. Barron's brief treatment relationship with Scott did not warrant attributing any special

21

significance to Dr. Barron's opinions about Scott's residual functional capacity.

The ALJ also indicated that Dr. Barron's opinions were inconsistent with other substantial evidence of record, including the expert medical opinion of Dr. Savage (Tr. 29-30). The ALJ noted that Dr. Barron's more restrictive opinions about Scott's residual functional capacity (i.e., that he would be incapable of performing even low stress jobs, that he would require frequent unscheduled breaks, and that he would frequently be absent because of seizures) found little support from the evidence of record, other than Scott's subjective allegations (Tr. 29). Indeed, Dr. Barron's restrictive opinions about Scott's limitations secondary to seizures stood in contrast to the opinions of Dr. Savage, who opined that Scott remained capable of performing a range of light work that did not involve climbing ladders, ropes, or scaffolds; work at unprotected heights; concentrated exposure to temperature extremes; or excessive stress in spite of his seizure disorder (Tr. 92-93). Because the ALJ reasonably found that Dr. Savage's opinion was well-supported by the record and consistent with substantial evidence as a whole, the ALJ appropriately discounted Dr. Barron's opinion to the extent that it was inconsistent with Dr. Savage's well-supported and detailed opinion (Tr. 29-30).

It is abundantly clear that the ALJ provided numerous sound reasons for discounting the opinion of Dr. Barron that were well-supported by the evidence of record.

Scott next argues that the ALJ erred in evaluating his RFC. The ALJ determined that Scott had the residual functional capacity to perform light work, but could not climb ladders, ropes or scaffolds, work around unprotected heights or hazards, and must avoid concentrated exposure to temperature extremes. (AR 25). The ALJ limited Mr. Scott to unskilled work "which doesn't have high production quotas or sales responsibilities." (AR 25).

Scott claims that the ALJ's residual functional capacity assessment was erroneous because she (1) did not determine the frequency of Scott's seizures; (2) limited him only to work which did

not require high production quotas (AR 25); and (3) did not include limitations based on Scott's deficiencies in memory and concentration. Specifically, Scott argues that the ALJ failed to make a definitive finding as to the frequency his seizures. The ALJ found that, although Scott testified to having two to three seizures per month (AR 58), the objective medical evidence did not support his testimony because he was non-compliant with treatment. (AR 29).

In response, the Commissioner points out that, contrary to Scott's argument, the ALJ did, in fact, make a definitive finding about the frequency of Scott's seizures. That is, the ALJ specifically found that the greatest number of seizures that Scott had experienced in any year during the relevant time period had been four, which indicates that Scott suffered seizures at a frequency of no more than one seizure per every three months (Tr. 31). In order to meet or equal a listed impairment for epilepsy, a claimant must demonstrate that he has experienced major motor seizures more frequently than once a month or minor motor seizures more frequently than once weekly in spite of at least 3 months of prescribed treatment. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02, 11.03; see also Social Security Ruling 87-6, 1987 WL 109184, at *3 (1987).

Notably, Dr. Savage testified that the record did not reflect that Scott had experienced seizures at a frequency of more than once per month (Tr. 85). Additionally, Scott himself told Dr. McKenna that he had experienced four seizures over the past year, a frequency that was fully consistent with the ALJ's finding (Tr. 374). Thus, given that the record reflected that Scott suffered seizures at a rate of no more than one per every three months during his most active year of seizure activity, the ALJ reasonably determined that Scott's seizures did not occur more frequently than once a month as required to meet Listing 11.02 (Tr. 25).

The ALJ also solicited testimony from the vocational expert, who testified that Scott would not be precluded from performing work so long as his unanticipated absences did not exceed one per

month (Tr. 100-01). Thus, since the ALJ reasonably determined that Scott's seizures did not occur more frequently than once per month on average, the ALJ reasonably concluded that the frequency of Scott's seizures would not preclude work activity (Tr. 25, 31, 100-01). Thus, contrary to Scott's assertion, the ALJ in this case appropriately assessed the frequency of Scott's seizures and reasonably determined that his seizures did not occur at a frequency that would preclude all work activity.

Scott also alleges that the ALJ improperly assumed that Scott's only seizures were accompanied by hospital visits. In support of his argument, Scott notes that he testified that he usually only went to the hospital when he had back-to-back grand mal seizures and that Dr. Barron reported that Scott experienced two to three seizures per month (Tr. 58).

However, as discussed above, the record does not support Scott's contention that he suffered grand mal seizures more frequently than once per month. In fact, Scott told Dr. McKenna, a consultative examiner, that he had experienced only four seizures over the past year (Tr. 374). As discussed previously, the medical records regularly reflected that Scott had reported that he had gone several months or more without suffering a seizure (Tr. 351, 374, 417, 542, 624). The medical records do not reflect that Scott reported having seizures on a more frequent basis than assessed by the ALJ, nor do they reflect that Scott only attended the emergency room when he had back-to-back seizures. Thus, contrary to Scott's argument, the ALJ did not discount Scott's subjective allegations about the frequency of his seizures because he improperly assumed that Scott's seizures were always accompanied by emergency room visits; rather, the ALJ's findings about the frequency of Scott's seizures were well supported by Scott's own self-reports about the frequency of his seizures as documented throughout the medical records. For the foregoing reasons, this court finds that the ALJ reasonably discounted Scott's credibility about the alleged frequency of his seizures and reasonably

determined that Dr. Barron's statement was not supported by the record (Tr. 28-29).

Scott also argues that the ALJ improperly assumed noncompliance without analyzing the record. Scott alleges that, on two occasions in March 2006 and September 2008, his Dilantin levels were within the therapeutic range when he presented to the emergency room with seizure activity. However, in making this assertion, Scott misstates the record, as the September 2008 finding that Scott's Dilantin level was within the therapeutic range was part of a routine well adult exam rather than any follow-up treatment for seizure activity (Tr. 601-03). Thus, rather than supporting Scott's argument, Scott's lack of seizure activity in September 2008 when his Dilantin levels were noted to be within the therapeutic range provides support for the ALJ's finding that Scott's seizures were reasonably well-controlled when he compliant with his medications. Furthermore, the mere fact that Scott's Dilantin level was noted to be within the therapeutic range following one seizure does not establish that Scott was compliant with his medication. SSR 87-6 specifically indicates that:

> [I]n cases in which there is convincing evidence of intermittent noncompliance . . . little weight should be given to sporadically obtained anticonvulsant blood levels, even if they are in the therapeutic range. In all cases . . . blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance with the prescribed treatment."

See SSR 87-6, 1987 WL 109184, at *3. In the present case, the ALJ reasonably considered the record evidence as a whole and noted that Scott's Dilantin level was found to be at a subtherapeutic level on nearly every occasion that he presented to the emergency room with seizure activity (Tr. 354, 433, 558, 560, 568, 583, 617, 618, 626, 627). Clearly, these consistent findings of subtherapeutic levels of Dilantin provide substantial support for the ALJ's finding that Scott was not compliant with his medications.

Scott also alleges that the ALJ improperly limited him to unskilled work without high production quotas. Scott argues that because he testified that he had lost jobs "due to not being able

to meet the quotas or goals that the bosses require," the ALJ should have further limited him to jobs that did not involve any production quotas whatsoever. However, it is clear that Scott's argument is without merit and that the ALJ reasonably considered Scott's testimony regarding specific triggers for his seizures, including stress associated with his job responsibilities (Tr. 31). The ALJ noted that Scott had essentially testified that any job would be too stressful for him to handle and would trigger seizures (Tr. 31, 60-62). The ALJ reasonably found that Scott's testimony regarding specifically what type of stress would trigger a seizure was somewhat vague and overbroad (Tr. 31). The ALJ reasonably noted that the record did not support Scott's allegation that all types of work would be too stressful for him to handle (Tr. 31).

The ALJ reasonably found that Scott's testimony suggested that the most stressful aspect of his past work was the need to meet a sales quota (Tr. 31). For example, Scott testified that he had experienced a seizure while working as a salesperson when he was behind on his daily sales quota and was attempting to make sales in order to reach his quota (Tr. 64-67). Scott testified that he was not often behind his sales quotas, but that, when he was behind on his sales quota, his level of stress increased, which he claimed sometimes triggered a seizure (Tr. 66-67). Thus, in order to accommodate Scott's reported difficulties handling workplace stress related to being behind on sales quotas, the ALJ reasonably limited Scott to jobs that did not involve sales responsibilities or high production quotas (Tr. 31). This functional limitation was specifically designed to preclude Scott from jobs that would involve stress associated with getting behind in achieving sales quotas, which Scott testified had caused his seizures in the workplace (Tr. 64-67). In order to further accommodate Scott's seizure disorder, the ALJ also limited Scott to unskilled work that required little judgment to do simple tasks that could be learned on the job in a short period of time (Tr. 31). Clearly, the ALJ reasonably accommodated Scott's seizure disorder by limiting him to unskilled work that did not

involve high production quotas or sales responsibilities, and Scott has not demonstrated that any further accommodations were supported by the record.

Scott also alleges that the ALJ did not address his alleged deficiencies in memory and concentration in her RFC finding. Scott claims that the ALJ did not address his allegations that he had a hard time staying focused and keeping up with work due to his limited ability to maintain concentration (Tr. 247, 504, 507) or Dr. Barron's opinion that Scott had moderate limitations in concentration, persistence, or pace (Tr. 590). However, contrary to Scott's arguments, it is clear that the ALJ properly considered Scott's allegations and reasonably determined that he did not need mental functional limitations in excess of those contained with the RFC finding. The ALJ explicitly noted that Scott had alleged that his seizures made it difficult for him to maintain concentration while working (Tr. 26). The ALJ then proceeded to discuss the relevant medical evidence of record and reasonably determined that Scott's subjective allegations were not supported by the evidence of record (Tr. 26-32).

The ALJ noted that Dr. McKenna performed a consultative psychiatric examination and determined that Scott did not have any type of discernible psychiatric impairment (Tr. 27, 377). Notably, Dr. McKenna reported that Scott's memory was entirely within normal limits during his mental status examination (Tr. 377). The ALJ also noted that a state agency reviewing psychologist opined that Scott did not have any medically determinable mental impairment (Tr. 27, 384). Based on his review of the medical records, Dr. John Tomassetti opined that Scott did not have a severe impairment that caused any limitations in concentration, persistence, or pace (Tr. 384). Furthermore, the ALJ noted Dr. Savage opined that Scott should avoid very stressful jobs due to his seizures, but did not identify any other mental limitations secondary to his seizure disorder (Tr. 30, 92-93).

27

The only medical source opinion of record that indicated that Scott had any limitations in concentration, persistence, or pace due to his seizure disorder was Dr. Barron (Tr. 590). However, as discussed previously, the ALJ reasonably discounted the weight given to Dr. Barron's opinion because it was not well-supported by the medical evidence, was inconsistent with other substantial evidence of record, and was not based on a significant treating relationship (Tr. 28-29). Thus, in light of the fact that the record did not contain any credible evidence indicating that Scott had any significant limitations in concentration, persistence, or pace, this court finds that the ALJ reasonably declined to find that Scott had any such mental limitations.

Scott also contends that the ALJ improperly evaluated his credibility by making unreasonable inferences that were not supported by the record. An ALJ's credibility determination is due special deference and should be overturned only if it is "patently wrong." See Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008). When reviewing the ALJ's credibility determination, the reviewing court does not undertake a de novo review of the medical evidence that was presented to the ALJ; rather the reviewing court "merely examines whether the ALJ's decision was reasoned and supported." Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). The Seventh Circuit has held that "[i]t is only when the ALJ's [credibility] determination lacks any explanation or support that [the reviewing court] will declare it to be patently wrong" and thus warrant reversal. Elder, 529 F.3d at 413-14.

This court agrees with the defendant that, contrary to Scott's argument, the ALJ's credibility finding in this case was reasonable and well-supported by the record. The ALJ reasonably found that, although Scott alleged that he never missed a dose of his seizure medication (Tr. 50), the medical evidence of record contrarily indicated that Scott had not been compliant with his prescribed medication regimen, as discussed in detail previously (Tr. 26-32). The ALJ further noted that,

whereas Scott alleged that his reported Dilantin levels were subtherapeutic due to his cigarette smoking (Tr. 50-51), Dr. Savage testified that Scott's explanation did not make any sense in the context of his medical records and treatment history (Tr. 86-87). Specifically, Dr. Savage testified that he was not aware of any such dramatic effects of cigarette smoking on Dilantin levels and that, if Scott's testimony were true, then his treating physicians would have either instructed him to stop smoking or would have adjusted his Dilantin dosage as needed to account for the effects of his cigarette smoking, neither of which occurred (Tr. 86-87). Thus, because Scott's statements regarding his compliance stood in contrast to the medical records, expert medical opinions, as well as his own prior admissions of noncompliance, the ALJ reasonably discounted his credibility on that basis (Tr. 32).

The ALJ also noted that Scott's allegations about the frequency of his seizures were not supported by the medical records. At the hearing, Scott testified that he had full breakthrough seizures once or twice a month and that he had smaller seizures almost every other day (Tr. 57-58). However, as discussed previously in detail, the medical records did not reflect that Scott suffered seizures as frequently as alleged. Indeed, the medical records regularly indicated that Scott had reported that he had gone months without suffering any seizures (Tr. 417, 558-64, 624). Thus, the ALJ reasonably discounted Scott's subjective allegations about the frequency of his seizures.

The ALJ also considered Scott's treatment that he had received for his seizures and noted that it also detracted from his credibility (Tr. 30-31). See 20 C.F.R. § 404.1529(c)(3)(v). The ALJ noted that Scott had only limited follow-up care for his seizures during the relevant time period despite the existence of clinics in his area that provided medical care regardless of the patient's ability to pay (Tr. 31, 88-90). Scott's failure to seek follow-up treatment for his seizures suggests that his seizure disorder was not as disabling as alleged.

29

The ALJ also reasonably found that Scott's allegations about the degree of limitations in his activities of daily living were not credible (Tr. 31). The ALJ noted that Scott had reported having minimal activities of daily living when he completed an Activities of Daily Living Questionnaire in October 2007 (Tr. 31). For example, Scott reported that he was unable to bathe or take a shower, unable to go shopping, and unable to prepare meals without supervision (Tr. 260-61). The ALJ noted that it was unclear why Scott's activities of daily living would be limited at all when he was not experiencing seizures (Tr. 31). The ALJ noted that even Dr. Barron, whose opinion was very favorable to Scott, indicated that Scott's seizures did not significantly impact his ability to perform activities of daily living (Tr. 590). Additionally, Scott reported that he was able to take care of his activities of daily living at a consultative examination (Tr. 382). Thus, because Scott's allegations about his activities of daily living were not well-supported by the record, the ALJ correctly further discounted the credibility of his allegations.

The ALJ also reasonably considered Scott's work history in evaluating his credibility (Tr. 31). The ALJ noted that Scott had been able to work full-time at a glass company at or near substantial gainful activity levels during his alleged period of disability (Tr. 24, 31, 48-49). Scott's ongoing ability to work during his alleged period of disability suggests that he was not as functionally limited as alleged. See Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that he could perform some work cuts against his claim that he was totally disabled."). Additionally, the record reflects that Scott continued to look for work during his alleged period of disability, which further cuts against his claim that he was totally unable to work as a result of his seizure disorder (Tr. 262, 382). See Castile v. Astrue, 617 F.3d 923, 930 (7th Cir. 2010) (noting that the ALJ's credibility finding was supported by the fact that Castile had applied for jobs following her alleged disability onset date); see also Schmidt v. Barnhart, 395 F.3d 737, 746 (7th

Cir. ) (recognizing that the ALJ may consider the fact the claimant represented to prospective employers that he was able and willing to work when making his credibility determination). Therefore it is clear that the ALJ reasonably found that Scott's work history also tended to undermine his credibility.

Accordingly, as the ALJ's decision is sufficiently supported by the record, the decision to deny benefits will be affirmed.

Conclusion

Based on the foregoing, the decision of the ALJ is hereby AFFIRMED.

Entered: July 22, 2011.

s/ William C.  Lee
William C. Lee, Judge
United States District Court